# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

NAWAL AL BAAJ,                    )
                                 )
          Plaintiff,             )
                                 )
vs.                              )     Case No. 4:10CV01547 AGF
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
          Defendant.             )

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Nawal Al Baaj was not disabled and, thus, not entitled to Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.§§ 1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on July 8, 1968, filed her application for benefits on September 18, 2006, at the age of 38, alleging an initial disability onset date of May 26, 1999, due to chronic pain in her back and neck radiating to her shoulders, arms, and legs, migraine headaches, seasonal allergies, numbness in her hands, anxiety, and depression. After Plaintiff's application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and such a hearing was held on April 14, 2008.  By decision dated May 27, 2008, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary

work and that there were jobs available in the national economy that she could perform, and was thus not disabled under the Act.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on June 22, 2010. Accordingly, Plaintiff has exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole.  Specifically, Plaintiff argues that the ALJ, in formulating the hypothetical question for the Vocational Expert ("VE"), failed to take into account all of Plaintiff's impairments and that the ALJ erred in rejecting Plaintiff's subjective complaints of pain.  Plaintiff asks that the case be reversed and remanded to the Commissioner for reconsideration.

**BACKGROUND**

**Work History and Application Forms**

Plaintiff was born and received her schooling through approximately the eighth grade, in Iraq.  The record indicates that Plaintiff has not worked since she moved to the United States in 1999.  (Tr. 24, 44-45, 126-27, 131, 150.)

In the Function Report of her application for benefits, Plaintiff stated that she lived in an apartment with her family.  She wrote that at that time, she cared for her three children, and she prepared three meals a day for her family.  She stated that her headaches, neck pain, and shoulder pain affected her sleep, and that she did not do household chores because the activities made her neck and shoulder pain worse.  Plaintiff

2

wrote that she was able to drive her car, but did not go out alone because her headaches bothered her.  She described her hobbies as "watching TV and playing with my kids," and stated that she participated in social groups once a month.  Plaintiff wrote that her "injuries" affected lifting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, and using her hands.  She explained that she could walk less than a block before she would have to rest, and that she could only pay attention for 20-30 minutes at a time.  (Tr. 133-140.)

In the Disability Report section of her application, Plaintiff wrote that she took Astelin, Ipratropium Bromide, and Loratadine for allergies, Naproxen, Nortriptyline, and Tramadol for pain, and Setraline for depression and anxiety.  Plaintiff stated that she suffered from migraine headaches, severe neck pain, and carpal tunnel syndrome, which caused nausea, blurred vision, pain, and numbness.  (Tr. 125-132.)   In her disability report Plaintiff also alleged a disability date beginning May 26, 1999, and that her disability worsened after she gave birth to her youngest son in 2007.

**Medical Record**

On September 8, 1999,[1] Plaintiff was seen at an outpatient clinic for complaints of tearfulness, mood swings, decreased sleep, and decreased energy.  She was diagnosed with depression and prescribed Paxil. (Tr. 170.)

On September 24, 1999, Plaintiff was seen for headaches that did not respond to

---

[1]    Unless otherwise stated, all doctors' visits, tests, and treatments were performed by physicians affiliated with clinics at the Barnes-Jewish Hospital.

3

Tylenol #3.  (Tr. 171.)  At a follow-up appointment on December 8, 1999, Plaintiff's

headaches and mood had improved.  (Tr. 173.)

On January 31, 2000, Plaintiff was seen for a prenatal visit.  The notes indicate

diagnoses of depression and sickle cell trait.  (Tr. 331.)  On March 16, 2000, Plaintiff was

admitted to labor and delivery in active labor.  (Tr. 178.)

On November 2, 2000, Plaintiff was seen for headaches which she reported

experiencing for one and a half years, and for right thigh numbness and pain, especially

with heavy lifting.  She was prescribed Ibuprofen for both the headaches and sciatica.

(Tr. 512-13,1048-49.)

At doctor's visits on  January 1, and April 20, 2001, Plaintiff continued to report

daily headaches with pain behind her eyes, rated at a 7 to 8 on a scale of 1 to 10,

photophobia, and continued difficulty with sciatica.  (Tr. 422, 521.)

Between June 1, 2001, through September 5, 2001, Plaintiff had three clinic visits

for headaches, sciatica, and GERD[2].  She was directed to resume Nortryptylline for her

headaches and Vioxx for her sciatica.  Plaintiff reported that even with medication she

had daily headaches, blurry vision, photophobia, nausea and vomiting.  (Tr. 378, 407,

416, 431.)

From September 17, 2001, through March 8, 2002,  Plaintiff was seen on four

occasions at a neurology clinic where she was being followed for her headaches.  The

───────────────

[2] Gastro Esophageal Reflux Disease.

4

headaches were diagnosed as right temporal migraines with aura, occurring 3 to 4 times daily and lasting 30-40 minutes.  Due to the severity of the headaches, a different medication, Timolol, was prescribed.  (Tr. 442, 466, 471, 473, 982.)

On May 19, 2002, Plaintiff was diagnosed with muscle spasm after being seen in the emergency room for complaints of left-sided chest and abdominal pain and shortness of breath.  (Tr. 301, 377.)  From July through November of 2002, Plaintiff was seen five times for complaints of persistent shortness of breath, daily headaches, left shoulder and neck pain, and occasional tingling in her left hand.  A possible diagnosis of trapezius strain appears in the medical record for this period.  (Tr. 327, 451, 455, 480, 956.)

On February 14, 2003,  Plaintiff was seen for melasma, and a cyst on her right hand with right hand pain.  She was diagnosed with a probable lipoma.  (Tr. 396.)

On April 22, 2003, an MRI of Plaintiff's cervical spine showed moderately large paracentral disc herniation at C5-6, desiccation, and tiny central disc herniation at C3-4 and C4-5 without evidence of central canal or neural foraminal stenosis at those levels. (Tr. 297.)  At a follow-up visit on July 25, 2003, Plaintiff was diagnosed with a bulging disc at C5-6, bilateral neck pain, left arm numbness, and tingling.  (Tr. 394.)

In June of  2004, Plaintiff was seen for complaints of right wrist pain, bilateral hand numbness, and pain between the second and third fingers.  An x-ray of Plaintiff's right hand taken on June 12, 2004, indicated positive ulnar variance.  Records from this period also indicate that Plaintiff continued to suffer from depression and was taking Paxil and Naproxen.  (Tr. 216, 279, 286.)

5

In August of  2004, Plaintiff was seen for a follow-up visit regarding her complaints of sharp chest pain that came on suddenly.  Her chest pain was deemed musculoskeletal in nature.  (Tr. 247.)

On September 10, 2004,  Plaintiff underwent right carpal tunnel release surgery.  One week after the surgery Plaintiff reported some pain in her index finger.  (Tr. 368.)

An MRI of Plaintiff's cervical spine taken in February 2006, showed mild to moderate multilevel degenerative disc disease with straightening of the cervical spine and moderate left neural foraminal stenosis at C5-6.  (Tr. 574, 605.)

In May 2006, Plaintiff was seen for an ER followup.  Her diagnoses were summarized as allergic rhinitis, fibromyalgia, anxiety, and Vitamin D deficiency.  (Tr. 574, 579, 794, 799.)

Plaintiff experienced an onset of depression in August 2006.  On September 14, 2006, Plaintiff was referred for further evaluation of her depression, which improved with medication and stabilized by October 30, 2006.  (Tr. 26, 532-33, 538).

On November 14, 2006, Plaintiff was seen for a neurological exam with a chief complaint of neck pain radiating into her shoulder and back pain radiating to her feet.  At that time it was noted that Plaintiff's pain had persisted for five years, and Plaintiff was given a diagnosis of musculoskeletal pain.  (Tr. 542, 545, 764.)

On November 29, 2006, Plaintiff underwent a consultative psychological evaluation and noted that she was not receiving psychiatric treatment at that time, and had never had a psychiatric hospitalization.  (Tr. 693.)  The evaluating psychologist, Dr.

6

Thomas Johns, made the following diagnoses: adjustment disorder with depressed mood,

currently mild with apparent benefit from treatment; pain disorder associated with

psychological factors and general medical condition; chronic daily headache; chronic low

back pain; GERD; allergies; carpal tunnel syndrome on the right side with previous

surgery; and a GAF[3] of  65.  Dr. Johns noted moderate impairment of Plaintiff's ability to

complete simple tasks in a timely manner over a sustained period of time uninterrupted by

symptoms of depression and/or chronic pain.  (Tr. 696-97.)

Dr. Johns also found Plaintiff's motor activity, posture, and gait normal.  During

the evaluation, Plaintiff denied problems with concentration or feelings of hopelessness

and noted only trivial and likely age-related difficulties with memory.  She also denied

suicidal ideation and "laughed heartily" when Dr. Johns asked her about suicidal history.

(Tr. 694-95.)

A Physical RFC Assessment completed by a medical consultant, J. Nanda, M.D.,

on December 13, 2006, indicated Plaintiff could lift 20 pounds occasionally, 10 pounds

frequently, stand about six hours in an eight hour workday, sit about six hours in an

---

[3]    A GAF score represents a clinician's judgment of an individual's overall
ability to function in social, school, or occupational settings, not including impairments
due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment
in reality testing or communication or "major" impairment in social, occupational, or
school functioning; scores of 41-50 reflect "serious" impairment in these functional areas;
scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild"
impairment.

eight-hour workday, push/pull unlimited, and had limited handling ability due to carpal

tunnel syndrome.  (Tr. 698-703.)

A Psychiatric Review Technique, completed by non-medical consultant A.

Krescheck on December 15, 2006, indicated that Plaintiff suffered from anxiety.  (Tr.

708.)  The report also indicated that Plaintiff had mild restriction in activities of daily

living, mild difficulties in maintaining social functioning, and mild difficulties in

maintaining concentration, persistence, and pace.  (Tr. 704-12.)

On January 3, 2007,  Plaintiff was seen for an obstetric visit.  Her active symptoms

were listed as abdominal pain, allergic rhinitis, depression and headache.  (Tr. 552.)

On April 16, 2007, Plaintiff was seen for complaints of left shoulder pain.  The

medical record of that exam indicates that Plaintiff's activities of daily living were

affected by her shoulder pain.  (Tr. 749.)

Plaintiff was hospitalized for twenty days in July of 2007, due to preeclampsia, a

toxic syndrome of late pregnancy, which resulted in HELLP,[4] hypertension, elevated

serum albumin levels, edema, and temporary multi-organ failure, including renal failure.

---

[4]   HELLP syndrome is "a life-threatening liver disorder thought to be a type of
severe preeclampsia.  It is characterized by hemolysis (destruction of red blood cells),
elevated liver enzymes (which indicate liver damage), and low platelet count.  Possible
complications of HELLP include disseminated intravascular coagulation (DIC), a clotting
disorder that leads to excess bleeding; pulmonary edema; kidney failure; liver hemorrhage
and failure; and separation of the placenta from the uterine wall.  Typically, after the
baby is born and HELLP syndrome has time to improve, most of these complications will
go away."  *www.nlm.nih.gov/medlineplus/ency/article/000890.htm*

(Tr. 26, 715-18.)  Though severely ill, Plaintiff recovered enough to be safely discharged home.  On July 30, 2007, when she was seen for a postpartum visit, the record indicates that she had postpartum renal failure, increased blood pressure and low platelets.  (Tr. 26, 715-18, 723-28.  (Tr. 738, 892.)  The notes from that visit also reported symptomatic improvement, stating that "she feels much improved from time of discharge, but still feeling fatigued."  (Tr. 738.)

Plaintiff was seen on August 20, 2007, for a follow-up visit.  She had the following active problems: abdominal pain, allergic rhinitis, depression, headache, pregnancy and allergies.  The record further indicated that Plaintiff had a NSTEMI[5] while she was hospitalized.  (Tr. 723-24.)  Plaintiff denied cardiovascular problems, gastrointestinal problems, musculoskeletal problems, or psychiatric problems.  Her blood pressure was also well controlled at that time.  In addition, her depression continued to be controlled and stable.  (Tr. 26, 723-24.)

Plaintiff was hospitalized for two days in late August 2007, with chest pain.  (Tr. 27, 1072-78, 1091-95.)  However, testing showed no evidence of coronary artery disease, and Plaintiff was discharged with medication on August 30, 2007.  (Tr. 27, 1068-69, 1091-95, 1098-1113, 1167.)  The discharge summary indicated diagnoses of atypical chest pain, possible NSTEMI, and possible HELLP syndrome.  (Tr. 1100.)  A CT scan of

---

[5]   NSTEMI, Non-ST elevation myocardial infarction, is a blockage of the coronary arteries without an increase in the streptokinase enzymes typically seen with other types of myocardial infarction.
http://heartdisease.about.com/od/heartattack/a/NSTEMI.htm.

Plaintiff's heart performed during the hospitalization showed normal coronary arteries, no evidence of thoracic aortic dissection, and normal left ventricular systolic function.  (Tr. 1167.)  A ventilation perfusion study also performed during the hospitalization showed normal ventilation and perfusion images.  (Tr. 1176.)

On July 8, 2008, Plaintiff was seen for headaches alternating between her right and left sides and bilateral shoulder and neck pain with occasional difficulty sleeping.  The notes from that visit indicate that she reports daily headaches for 4-5 years, and suffers from allergies and depression, partially controlled.  (Tr. 666.)

**Evidentiary Hearing of April 14, 2008 (Tr. 35-73.)**

Plaintiff, who was represented by counsel, testified that she had lived in the United States since 1999, and attained citizenship in 2004 or 2005.  She stated that she was 39 years old, 5' tall and weighed 117 pounds.  Plaintiff was married with four children, ages 17 years, 8 years, 4 years, and 9 months old, and lived in a two-family house.  She stated that she had a driver's license, but only drove distances of about two or three miles from her house.  Her husband brought in income and her family received $700.00 per month in food stamps.  Plaintiff testified that she had never worked because of " health problems with [her] shoulders," and she had never received unemployment benefits, but did have medical insurance.

Plaintiff testified that she had an eighth-grade education and had never attended school in the United States.  She worked "as a housewife" and could read English, but sometimes could not "tell whether [she was] understanding what's being said or not."  She

10

understood street signs when she drove, but if someone gave her an address that she did not know, she would not know how to look for it.

Plaintiff reiterated that she was not currently working, and had never been employed or applied for a job because her "health doesn't allow [her] to." She could cook, wash clothes, make the beds, vacuum, mop, and sweep, but sometimes required the help of her husband and son with these activities. Plaintiff testified that every once in a while, she broke a dish while washing the dishes because her "hand had an operation" and sometimes had trouble grabbing things. She went grocery-shopping with her husband at times, but other times, he would go by himself.

Plaintiff explained that in the morning, she tended to her baby and cooked for her family. She did not always have the strength to carry her nine-month old baby, who weighed about 15 pounds, and would feel like she was "suffocating." In the afternoon, Plaintiff stayed at home with her children, and in the evening, she went out to the garden with her children to let them play. On the weekends, she stated that she spent time with her children, and that her husband took the kids out while she stayed at home.

Plaintiff testified that she had some friends, but she did not see them very often because everyone was busy. She watched television "baby programs" with her children, and did not read very much because it caused headache, dizziness, and nausea. Plaintiff stated that when she went outside, her breath would become "too much" and she would just watch her children play on the playground.

Plaintiff then reviewed her medications and stated that they did not cause her any

side effects.  Plaintiff testified that her high blood pressure started during her last

pregnancy, and it caused a "little stroke," and complications in her kidneys and heart.  She

also stated that she was allergic to dust and fumes.  She explained that she had pain that

came up her neck and caused her to be unable to lie down.  Plaintiff testified that she had

an operation on her hand, which caused it to "feel a little numb" at times.  She was able to

use her hands to button and zip, feed herself with a knife, fork, and spoon, put on socks,

open a doorknob, and pick up change in a store, although usually the cashier would have

to slide it over the table.

Plaintiff testified that she had headaches two or three times a week, which were

helped by medicine.  She had "rheumatism" and pain in her neck "nearly always" that

increased when she turned her head.  Plaintiff stated that she experienced depression when

her physical condition worsened, and she became frustrated that she was not able to do

what needed to be done with her children.  She testified that she had never been placed in a

mental hospital, tried to kill herself, or had hallucinations, but she had trouble with

concentration since the delivery of her last child.

Plaintiff testified that she could not stand very long because of the pain in her legs

and back.  She stated that she could lift one to two pounds and pour a glass of milk out of a

gallon jug, even though this caused her pain.  Plaintiff had trouble bending, but could stoop

and kneel.  She could crawl, but this hurt her knees a lot.  Plaintiff explained that if her

children grabbed her shoulders, it felt like "fire coming through [her]."  She stated that she

could climb steps, but had to rest a lot because she got tired and short of breath.

Plaintiff stated that as a result of her heart attack, she became "very tired, very quickly," and could not walk long distances.  She explained that when moving from a lying position to a sitting position in the morning, her heart would start beating very fast.  Plaintiff explained that her heart situation affected her housekeeping because she had pain in her shoulders and legs, and got tired and out of breath very quickly.  She stated that sometimes she became dizzy twice a day, and would have to lie down for about half an hour before the dizziness went away.

Plaintiff testified that the pain in her shoulders migrated down her arms and her legs, and that she took two Tylenol pills and other medication for the pain, and planned to take stronger medication once she stopped breast-feeding her baby.  She stated that she used her inhaler about two times per day.  Plaintiff testified that the pain in her back never went away, and that her leg pain was "nearly permanent," and increased with coldness or movement.  She explained that sometimes when she did not move, she would get cramps and would have to massage her legs for 20 minutes to half an hour until the cramps went away.  Plaintiff testified that the medications she took affected her stomach and caused constipation.

Plaintiff stated that she had a Missouri Medicaid card, and that all of her medical care was being handled at Barnes Jewish Hospital clinics.

Plaintiff's son, Muslim Alyasseri, then testified that he lived with his parents and siblings, was a senior in high school, and was planning on attending college after graduation.  He stated that he helped his mother take care of his eight-month old and four-

year old little brothers, and mopped, vacuumed, and did laundry because Plaintiff became dizzy when she went up and down stairs.  Mr. Alyasseri testified that he had seen Plaintiff fall three to four times, and that these falls had started about a month ago.  He stated that his father often helped Plaintiff take care of the children, clean, and cook as well.  Mr. Alyasseri testified that he was the one who usually took his mother to the doctor, and that he believed Plaintiff had been to a psychiatrist.

Mr. Alyasseri stated that he had seen Plaintiff when he believed she was depressed and described her as nervous and mad when his siblings fought.  He explained that Plaintiff would sit for about 30 minutes and then she would calm down, but would still have headaches after that.  Mr. Alyasseri testified that Plaintiff's problems became worse after she had his new baby brother.  He explained that Plaintiff had severe heart problems, kidney problems, high blood pressure, and a "half heart attack," and was given a 90 percent chance of not surviving the heart problems.

Mr. Alyasseri testified that he did not stay after school for extra-curricular activities anymore because he had to come home and help Plaintiff.  Before Plaintiff's heart problems, Mr. Alyasseri was involved in soccer and baseball.

The VE then testified that Plaintiff did not have any past relevant work.  The ALJ asked the VE to consider an individual of Plaintiff's age, education, and lack of work experience, who was capable of performing the exertional demands of light work; could lift, carry, push, and pull 20 pounds occasionally, and 10 pounds frequently; could sit, stand, and walk each for six out of eight hours; should not be exposed to ladders, ropes,

scaffolds, moving machinery or unprotected heights; should not be exposed to dust, fumes, gases, or chemicals; and because of the limited ability to speak English, would be limited to simple, repetitive tasks and instructions.

The VE testified that such an individual could perform the work of a light, unskilled hand packer, such as a paper filler, and an unskilled assembler, such as a light fixture assembler. The VE testified that such jobs existed in significant numbers in the local and national economies.

The ALJ then asked the VE to consider an individual of Plaintiff's age, education, and lack of work experience, who was capable of performing the exertional demands of sedentary work, and had all of the restrictions of the first hypothetical, except this person was limited to lifting ten pounds occasionally and less than ten pounds frequently.

The VE testified that such an individual could perform the work of a sedentary, unskilled assembler or a production inspector. The VE stated that such jobs existed in significant numbers in the local and national economies.

The VE was then asked by Plaintiff's counsel to consider the ALJ's first hypothetical, but to add that the individual could only stand or sit for 15 minutes at a time, would have difficulty walking, and would require rest of the arms if the arms were used for more than 30 minutes at a time. The VE testified that such an individual could not complete even a full range of sedentary work or an eight-hour work day.

The VE was then asked to consider the ALJ's first hypothetical, but to add that the person had problems with light-headedness and dizziness that was not predictable and

15

could come on as many as two times a day, and as a result, the person would have to sit down before beginning labor again for at least 15 minutes at a time.  The VE testified that if the individual required additional unscheduled breaks other than a lunch break and 15 minute breaks in the morning and afternoon, that person would be unable to perform the light and unskilled work that he had previously indicated.

The VE was then asked to consider the ALJ's first hypothetical, but to add that the individual had been diagnosed with depression, an adjustment disorder with depressed mood, and a pain disorder associated with psychological factors, as well as chronic daily headaches, and a GAF score of 65.  The VE testified that it would depend on the vocational applications of the various disorders, but that a GAF score of 50 or below would indicate severe problems that would preclude employment.

The VE was then asked by Plaintiff's counsel to consider the ALJ's first hypothetical, but to add that the individual had a prior myocardial infarction and would have to lie down twice a day for approximately 30 minutes.  The VE testified that this would preclude all employment.

**ALJ's Decision of May 27, 2008 (Tr. 24-31.)**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since moving to the United States in 1999, and had the impairments of migraine headaches, seasonal allergies, melasma, gastroesophageal reflux disease, mild arthralgia, hypertension, mild anxiety and depression, status-post right carpal tunnel syndrome, and status-post HELLP syndrome, but that none of these impairments, individually or in combination,

16

equaled the severity requirement listed in the Commissioner's regulations.

The ALJ summarized the medical record and found that the preponderance of the medical and other evidence was inconsistent with Plaintiff's allegation of disability.  The ALJ stated that over the years, Plaintiff had reported "intermittent" complaints of pain in her neck, left shoulder, legs, back, and feet, and of dizziness, abdominal pain, constipation, and anxiety, but that these complaints or symptoms had never been constant or chronic and had been responsive to the treatments provided.  He further noted that Plaintiff's onset of depression in August 2006 was stabilized by October 30, 2006, and that the consultative psychological examiner assessed only a mild adjustment disorder with depressed mood and a GAF score of 65.

Furthermore, the ALJ noted that Plaintiff was hospitalized on July 8, 2007, for 20 days with preeclampsia, and she experienced multi-organ failure, including renal failure, but by July 30, 2007, all of the symptoms had abated and Plaintiff only had "some continued mild fatigue."  Plaintiff alleged tension headaches as of August 7, 2007, but by August 20, 2007, her depression was still stable and she was taking medication for hypertension.

The ALJ concluded that Plaintiff had the physical RFC to "perform the physical exertional and nonexertional requirements of work except possibly for prolonged or frequent standing or walking, lifting or carrying objects weighing more than 10 pounds; climbing of ropes, ladders or scaffolds, doing more than occasional climbing of ramps and stairs or balancing, stooping, kneeling, crouching, or crawling; having concentrated or

17

excessive exposure to unprotected heights or dangerous moving machinery; doing more than simple, repetitive tasks; or having to communicate in English."

Although the VE testified that Plaintiff would be unemployable if she had limited range of motion of the back or neck, or had frequent severe headaches or dizziness or lightheadedness during the day, or if she had to lie down for at least 30 minutes each work day, or had a GAF consistently of 50 or below, the ALJ found that these assumptions were not valid or justified by the preponderance of the medical evidence and opinions on the record. The ALJ noted that there had never been any x-ray evidence of objective medical foundation for her musculoskeletal complaints, other than one instance of right carpal tunnel syndrome in 2004. There was no documented medical records of headaches, dizziness, lightheadedness, or falling episodes occurring often enough to prevent Plaintiff from maintaining a normal work schedule. Additionally, all of Plaintiff's other impairments had been shown to be controlled by medication, with very few acute disturbances.

The ALJ noted that no doctor who had treated or examined Plaintiff had stated or implied that she was disabled or totally incapacitated. Plaintiff had no surgeries or hospitalizations in recent years, other than the ones that occurred in July and August 2007, had not been referred to physical therapy, a pain clinic, or a pain disorder specialist, and there were no documented records of any significant, uncontrollable adverse side effects from her medications. The ALJ concluded that "[t]o the extent that the [Plaintiff]'s daily activities are restricted, they are restricted much more so by her choice than by any

18

apparent medical proscription."

The ALJ also concluded that the testimony by Plaintiff's son at the hearing was not proof of disability for three reasons. First, Plaintiff's son was not medically trained to make exacting clinical determinations and observations concerning the frequencies, types and degrees of Plaintiff's medical signs and symptoms. Second, Plaintiff's son was "undoubtedly influenced" by his affection for Plaintiff and his "natural tendency to believe and support her." Third, the testimony of Plaintiff's son was inconsistent with the preponderance of the opinions and observations of qualified medical personnel in the record.

The ALJ characterized Plaintiff's allegations of impairment as "either serious but short in duration, mildly to moderately serious, but controlled by medication or other unobstructive treatment, short-term and not serious, or not serious whether medically addressed or not." Based on Plaintiff's exertional functional capacity for at least sedentary work and the VE's testimony, the ALJ determined that Plaintiff could perform the work of a sedentary assembler, and was thus not disabled under the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). The court "may not reverse . . . merely because substantial evidence would

support a contrary outcome.  Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion."  *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

A special technique is used to determine the severity of mental disorders.  This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *Id.* § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration

requirement, the claim is denied.  Otherwise, the Commissioner determines at step three

whether the claimant's impairment meets or is equal to one of the deemed-disabling

impairments listed in the commissioner's regulations.  If not, the Commissioner asks at step

four whether the claimant has the RFC to perform her past relevant work.  If so, the

claimant is not disabled.  If she cannot perform past relevant work, the burden of proof

shifts at step five to the Commissioner to demonstrate by application of the Vocational

Guidelines[6] that the claimant retains the RFC to perform work that is available in the

national economy that is consistent with the claimant's vocational factors -- age, education,

and work experience.  In support of the RFC determination, the Commissioner may rely

upon the testimony of a vocational expert in response to a hypothetical question that takes

into account all of the claimant's impairment that the ALJ properly finds are supported by

the record as a whole.  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix*

*v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).

## The ALJ's Consideration of Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ failed to consider her subjective complaints of

symptoms under the proper standard and that Plaintiff's daily activities did not support the

ALJ's discrediting the extent of Plaintiff's alleged impairments.  In *Polaski v. Heckler*, 739

F.2d at1320 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective

---

[6]    Vocational guidelines, or grids, "are a set of charts listing certain vocational
profiles that warrant a finding of disability or non-disability."  *McCoy v. Astrue*, 648 F.3d
605, 613 (8th Cir. 2011) (citing 20 C.F.R. Part 404, Subpt. P, App. 2).

medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Id.* at 1322.  The Court explained that in evaluating a claimant's subjective complaints of pain, an ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *Id.*

After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record that caused him to reject the claimant's complaints. *Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998).  The ALJ need not discuss each factor listed in *Polaski*, so long as the analytical framework is recognized and considered. *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004).  In evaluating a claimant's subjective allegations of pain, the question is not whether the claimant suffers any pain; it is whether the claimant is fully credible when claiming that the pain is so great that it prevents the claimant from engaging in any substantial gainful activity.  The issue is not whether the claimant actually experiences the subjective complaints alleged, but whether those symptoms are credible to the extent that they prevent her from performing substantial gainful activity. *See Baker v. Apfel*, 159 F.3d 1140, 1145 (8th Cir. 1998); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).

Here the ALJ gave several reasons for discrediting Plaintiff's testimony regarding her subjective complaints, including Plaintiff's lack of work history, her ability to care for

22

her four children, drive, cook, and do light housework, as well as the absence of a medical

opinion that Plaintiff was disabled.  In addition, the ALJ properly considered the overall

record of evidence and discussed such factors as objective medical evidence, third party

testimony, treatment measures and the effectiveness of such treatment measures.  The ALJ

noted that over the years, Plaintiff had "intermittent complaints" of pain in her neck, left

shoulder, legs, back, and feet, and of lightheadedness, anxiety, headaches, epigastric issues,

seasonal allergies, and dizziness, but that these complaints had been responsive to

treatment and were not lasting or chronic.  The ALJ further noted that Plaintiff's depression

was stabilized on medication within several months of onset, and the consultative

psychological examiner assessed only a mild adjustment disorder with depressed mood and

a GAF score of 65.  The ALJ also gave several reasons for discounting the testimony of

Plaintiff's son regarding her allegations of disability, including bias arising from his

affection for his mother and lack of medical training.

These were valid factors to consider.  *See, e.g.*, *Masterson*, 363 F.3d at 731

(plaintiff's daily activities including ability to care for herself independently, assist in the

care of her grandchildren, cook, and do light cleaning supported ALJ's determination that

plaintiff's pain was not as severe as alleged);  *Fredrickson v. Barnhart*, 359 F.3d 972, 976

(8th Cir. 2004) (ALJ properly considered plaintiff's work record reflecting relatively low

earnings and multiple years with no reported earnings as pointing to a potential lack of

motivation to return to work); *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (grocery

shopping, driving, and daily child care inconsistent with claims of disabling pain).

23

In addition, the ALJ properly considered the intermittent nature of Plaintiff's complaints and the effectiveness of various treatments to address them. The medical record reflects that even with respect to her complaints of headache and neck pain, which have persisted over a relatively long period of time, Plaintiff sought treatment only sporadically with long periods of time intervening between requests for treatment. In addition, when Plaintiff did seek treatment the record indicates that Plaintiff's symptoms responded to the prescribed medication or treatment. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)).

The ALJ also noted that no doctor who treated or examined Plaintiff imposed specific long-term limitations on her ability. The absence of substantial or long-term physician-imposed work limitations on Plaintiff's exertional abilities is significant. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability)). Despite the persistence of certain symptoms, such as headache and neck pain, no physician expressed the opinion that these symptoms affected Plaintiff's ability to perform basic work-related exertional activities.

The ALJ's findings regarding plaintiff's credibility are properly applied to her son's testimony. *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (ALJ's findings concerning the credibility of third party evidence may involve the same evidence used to find a claimant not credible). In addition, "[c]orroborating testimony of an individual living

24

with a claimant may be discounted by the ALJ, as that person has a financial interest in the outcome of the case." *Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006).

For these reasons, the Court concludes that the ALJ properly considered Plaintiff's subjective complaints by applying the *Polaski* factors and, as required by *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)*, gave express reasons for discrediting testimony regarding those complaints.

**The ALJ's Reliance on the VE's Testimony**

Plaintiff contends that the ALJ's hypothetical questions failed to include limitations as to her ability to use her arms or her mental condition and that when the VE was presented with a different description of her limitations, as propounded by Plaintiff's counsel, the VE determined that such an individual would not be employable.  Thus, Plaintiff argues, the ALJ committed reversible error by posing and relying upon an  inadequately specific hypothetical.

 Although the hypothetical question must set forth with reasonable precision the claimant's impairments, it need only include those impairments and limitations found credible by the ALJ.  *See Heino v. Astrue*, 578 F.3d 873, 882 (8th Cir. 2009) (citing *Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998)).

Here, the sedentary RFC reflected in the ALJ's hypothetical question, with additional limitations for postural climbing activities, environmental exposure, and limitations to simple and repetitive tasks, is significantly limiting, and includes the limitations the ALJ found credible, relevant, and supported by the record.  The ALJ explicitly found that the

25

excluded assumptions were not valid or justified by the preponderance of the medical evidence and opinions on the record.  He noted that there was no objective medical foundation for Plaintiff's musculoskeletal complaints, other than the surgically corrected instance of right carpal tunnel syndrome, and that there were no documented medical records of recently occurring headaches, dizziness, lightheadedness, or falling episodes of sufficient frequency to prevent Plaintiff from maintaining a normal work schedule.  Having already determined that the ALJ properly discounted Plaintiff's subjective allegations of impairment, the Court cannot conclude that the ALJ erred in posing a hypothetical which did not include the previously discredited allegations.  *Id.*

## **CONCLUSION**

In accordance with applicable statutes and regulations, Plaintiff  had a fair hearing and full administrative consideration of her application for Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381-1383f.  Substantial evidence on the record as a whole supports the Commissioner's decision regarding Plaintiff's application.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 16th day of March, 2012.

26